<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| **BOARD OF TRUSTEES OF THE TRUCKING EMPLOYEES OF NORTH JERSEY WELFARE FUND, INC.-PENSION FUND,** | : | |
| **Plaintiff,** | : | **Civil Action No.: 15-889 (ES) (JAD)** |
| **v.** | : | **OPINION** |
| **160 EAST 22ND STREET REALTY, LLC et al.,** | : | |
| **Defendants.** | : | |

SALAS, DISTRICT JUDGE

## I.   INTRODUCTION

Pending before the Court is a Motion to Dismiss and, in the alternative as to Count 4 of the Complaint, a Motion for Partial Summary Judgment, filed by the Business Entity Defendants ("BEDs").[1]   (D.E. No. 32).   Plaintiff—Board of Trustees of the Trucking Employees of North Jersey Welfare Fund, Inc.-Pension Fund ("Plaintiff" or "Pension Fund")—filed opposition, (D.E. Nos. 35, 45), and BEDs filed a reply, (D.E. No. 38).   The matter is ripe for review.

---

[1] "Business Entity Defendants" is the moniker used by the parties to denote a group of thirty-nine out of the forty-one named defendants in this action, *i.e.*, all defendants except for Defendant Vincenzo Alessi and Defendant Duramix Concrete Corp.   Specifically, the Business Entity Defendants are comprised of the following defendants:  160 East 22nd Street Realty, LLC; 195 East 22nd Street Urban Renewal, LLC; 16-18 West 32nd Street, LLC; 19th Street Associates, LLC; 458-460 Broadway, LLC; 50 Oak Street Realty, LLC; 662 Ave Suburban Renewal, LLC; 52nd Street Associates, LLC; Alessi Organization Management, LLC; Alessi Partners, LLC; Atlantic Cement Realty, LLC; Bayonne Durable Construction Co., Inc.; Bayonne Trailer Park Associates, LLC; Blue Circle Equity Advisors, LLC; Blue Circle Terminals, LLC; Bridge Avenue Associates, Inc.; C&A Development Corp.; Durable Recycling Holdings, LLC; Durable Recycling, LLC; Duramental Management, LLC; Duraport Holding Company, LLC; Duraport Marine and Rail Terminals, LLC; Duraport Rail Terminal, LLC; Duraport Ready-mix, LLC; Duraport Realty Four, LLC; Duraport Realty One, LLC; Duraport Realty Three, LLC; Duraport Realty Two, LLC; Duraport Terminal Equipment, LLC; Hobart Realty, LLC; Hudson Keystone Express, LLC; North Street Development, LLC; Peninsula Court II, LLC; Peninsula Court, LLC; South Cove Development II, LLC; South Cove Development, LLC; South Cove Management, LLC; South Cove Partners, LLC; West 6th Street Realty, LLC.

The Court decides the Motion without oral argument.  *See* Fed. R. Civ. P. 78(b).  For the following reasons, BEDs' Motion for Partial Summary Judgment is GRANTED in part and DENIED in part; BEDs' Motion to Dismiss is GRANTED in part and DENIED in part.

## II. BACKGROUND

### A. Facts[2]

The Pension Fund is "a multi-employer employee benefit plan as defined in [the Employee Retirement Income Security Act ("ERISA")]"; it "is comprised of Trustees that are fiduciaries as defined by ERISA" and it is "administered pursuant to ERISA."  (D.E. No. 1, Complaint ("Compl.") ¶¶ 8, 9).  Defendant Duramix Concrete Corporation ("Duramix") is "one of the many business entities comprising the Alessi Family Enterprise" (the "Enterprise"), (*id.* ¶ 24), which Plaintiff alleges is a collection of business entities owned by members of the Alessi family, (*see id.* ¶¶ 23, 24).[3]

BEDs are business entities organized and registered in the State of New Jersey—with the exception of Defendant South Cove Management, LLC, which is organized as a Delaware business entity and registered to conduct business in New Jersey as a foreign business entity—and constitute members of the Enterprise.  (*See id.* ¶¶ 12, 21, 23, 24, 27).  Defendant Vincenzo Alessi "is the Principal and President of [BEDs], as well as a shareholder and/or member of the business entities comprising the Alessi Family Enterprise."  (*Id.* ¶ 13).

Plaintiff, upon information and belief, alleges that BEDs presently are owned by some combination of Vincenzo Alessi, Susan Alessi (Vincenzo Alessi's wife), Nancy Alessi (Vincenzo

---

[2] The following facts, assumed as true for purposes of resolving BEDs' Motion to Dismiss, are recited for purposes of background only.  To the extent necessary, additional facts will be included in the analysis where relevant.

[3] It is not clear from the Complaint whether the Alessi Family Enterprise allegedly is comprised exclusively of BEDs and Duramix, or whether the Enterprise allegedly is comprised of BEDs, Duramix, and additional, unidentified entities.

Alessi's sister), and Francesco Alessi (Vincenzo Alessi's brother).  (*Id.* ¶ 23).  Additionally, Gaetano Alessi, Jr. and Salvatore Alessi, both of whom are brothers of Vincenzo Alessi, held "shares and/or ownership percentages of various" BEDs at "times relevant to this action."  (*Id.*).

Two non-parties to this action are relevant to this exposition of the facts.  The first, Teamsters Union No. 560 ("Local 560"), "is the sole and exclusive bargaining representative for a group of employees formerly employed by" Duramix.  (*Id.* ¶ 11).  The second, Personnel Coordinators, Inc. ("PCI"), is a company that contracted with Duramix to provide Duramix "various payroll and related services."  (*Id.* ¶ 14).  Local 560 "was signatory to collective bargaining agreements with" Duramix and PCI.  (*Id.*).

On or about February 19, 2010, Duramix withdrew from the Pension Fund.  (*Id.* ¶ 15).  "A dispute arose over the withdrawal liability assessed against PCI and Duramix,"[4] and the dispute "was submitted to arbitration before [a] neutral Arbitrator."  (*Id.*).  On November 21, 2011, the arbitrator awarded $1,924,787 to the Pension Fund to be paid by PCI and Duramix.  (*Id.* ¶ 16; *see also* D.E. No.  32-2, Declaration of Vincenzo Alessi ("Alessi Dec."), Ex. B - Arbitrator's Opinion and Award ("Arb. Op.")).

PCI filed a civil action seeking to set aside and vacate the arbitration award.  (Compl. ¶ 17; *see also* Alessi Dec., Ex. C - Final Order and Opinion in Civil Action No. 11-7392 (D.N.J. Aug. 24, 2012) ("Dist. Ct. Op.")).  "In response and opposition to PCI's Motion to Vacate, the Pension Fund cross-moved against Duramix and through which cross-motion Duramix was joined as a third-party defendant."  (Compl. ¶ 18).

The Pension Fund and PCI reached a settlement, which reduced the amount owed to the Pension Fund to $1,316,901.60.  (*Id.*; Dist. Ct. Op. at 2).  On August 24, 2012, faced with cross-

---

[4] In its Complaint, Plaintiff uses all capital letters to refer to certain Defendants.  To enhance readability, the Court does not do so in this Opinion.

motions for summary judgment from the Pension Fund and Duramix, the Court entered judgment against Duramix in that amount.  (*See* Compl. ¶¶ 19, 20; Dist. Ct. Op. at 2, 6).

The Pension Fund filed this action pursuant to 29 U.S.C. § 1381 to recover the withdrawal liability owed to it because of Duramix's withdrawal. (Compl. ¶ 1).  Indeed, "[t]o date, the Pension Fund has not received any payment of the withdrawal liability from [Duramix] or any . . . Business Entity Defendant."  (*See id.* ¶¶ 58-60).

Three BEDs are specifically discussed in the Pension Fund's Complaint.  Alessi Organization Management Company, LLC ("AOM") "was a business entity founded by [Alessi] for the sole and express purpose of performing accounting, record keeping, billing and banking services for the various entities comprising the . . . Enterprise."  (*Id.* ¶ 25).  Bayonne Durable Construction Co., Inc. ("Bayonne Durable") provided construction and related services.  (*Id.* ¶ 24).  Durable Recycling, LLC ("Durable Recycling") also provided construction and related services. (*Id.*).  AOM, Bayonne Durable, Durable Recycling, Duramix, various real estate entities in the Enterprise, and other various business entities of the Enterprise operated out of 160 East 22nd Street, Bayonne, New Jersey, at all times relevant to this action.  (*Id.* ¶ 35).

Duramix operated a concrete plant and provided concrete to "various entities," including Bayonne Durable, Durable Recycling, and "various real estate entities" in the Enterprise.  (*Id.* ¶ 38).  That concrete was used to construct and develop the various locations owned and operated by the real estate entities in the Enterprise. (*Id.*).  Duramix also provided trucking services.  (*Id.* ¶ 49).  Bayonne Durable transported sand to Duramix to use in the concrete plant, and Duramix provided concrete to Bayonne Durable in lieu of paying rent to Bayonne Durable for use of the concrete plant.  (*Id.*).  None of these transactions and exchanges of goods and services were effectuated by an exchange of funds, were subject to formal lease or lending agreements, or were

4

collateralized, and no interest was calculated or paid for amounts owing among and between the various entities. (*Id.*).

AOM provided management services to BEDs, utilizing the offices at 160 East 22nd Street to provide accounting, billing, and banking functions to the Enterprise, (*id.* ¶ 36), and charging "a flat fee of 10% of their gross sales in return for" AOM's services, (*id.* ¶ 26). But that 10% fee was not billed or invoiced to BEDs, nor was it regularly collected; instead, Vincenzo Alessi, "as Principal, President and/or Managing Member of [BEDs], in his sole discretion periodically determined which [BEDs'] fees would be collected by AOM, and in what amounts AOM would collect such fees." (*Id.* ¶ 27).

Duramix borrowed money from AOM and Bayonne Durable, and borrowed and loaned money to Durable Recycling. (*See id.* ¶¶ 28, 43). At present, Duramix owes AOM approximately $5,000,000 resulting from the 10% service fee being applied to approximately $50,000,000 of gross sales by Duramix. (*Id.* ¶ 28). "In many cases," money that Duramix borrowed from Bayonne Durable was not paid back; instead, Duramix received credit toward the money it owed Bayonne Durable by providing concrete to Bayonne Durable free of charge. (*Id.* ¶ 43).

Duramix has failed to operate profitably since as far back as the late 1990's; indeed, "[f]rom 2008 to the present, despite generating gross sales in excess of $50,000,000, Duramix did not post a profit." (*Id.* ¶ 29).

The various entities in the Enterprise loaned money to each other, but "no formal lending agreements were executed, no collateral was pledged, interest on such loans was neither charged by the lending entity to the borrowing entities, nor did the borrowing entities pay interest on such loans to the lending entities." (*Id.* ¶ 30). The Enterprise chose to forego charging such interest,

despite understanding the Internal Revenue Service's rules relating to charging interest on such loans, and instead decided to accept any penalties assessed by the IRS.  (*Id.* ¶ 31).

Further, various BEDs would satisfy the financial obligations of other Enterprise entities by, for example, paying off mortgages and satisfying loans.  (*Id.* ¶ 48).  Satisfaction of such obligations was not performed subject to any memorialized agreement or collateralization.  (*Id.*).

At all times relevant to this action, the entities in the Enterprise shared employees, office equipment, office space, and heavy machinery, including a street sweeper, and while the entities using the street sweeper remitted rental fees to Duramix for such use, no contract was executed to memorialize the terms for the use.  (*Id.* ¶¶ 37, 47).

 "At all times relevant to this action, Business Entity Defendants did not issue dividends to members or shareholders."  (*Id.* ¶ 50).

## B.  Procedural History

The genesis of this dispute dates back to 2010 when, as discussed above, Duramix withdrew from the Pension Fund.  After receiving an arbitration ruling in its favor in 2011, (*see* Arb. Op.), and a District Court ruling confirming that arbitration award and entering judgment in its favor in 2012, (*see* Dist. Ct. Op.), the Plaintiff filed this action on February 5, 2015, (Compl.). Plaintiff's Complaint alleges the following counts against BEDs:  Count 1 for "Withdrawal Liability," (*id.* at 15); Count 2 for "Single Employer/Alter Ego Liability," (*id.* at 17); Count 4 for "Control Group Liability," (*id.* at 26); Count 5 for "'Avoid and Evade' Liability," (*id.* at 27); and Count 6 for "Clawback Liability," (*id.* at 28).[5]

---

[5] Count 3 for "Business Entity Veil Piercing Liability" appears to seek to pierce the corporate veils of Duramix and BEDs in order to hold Vincenzo Alessi liable.  (Compl. ¶¶ 89-98).  Indeed, Count 3's "Wherefore" clause seeks damages from Vincenzo Alessi personally.  (*Id.* at 25; Pl. Opp. Br. at 29 (referring to "the Pension Fund's cause of action for piercing the corporate veil to establish liability against Individual Defendant, Vincenzo Alessi")).  BEDs' motion does not address Count 3, (Def. Mov. Br. at 31), so that Count is not before this Court.

BEDs filed their original motion to dismiss (and/or for partial summary judgment as to Count 4) on June 22, 2015.  (D.E. No. 17).  After Plaintiff requested and was granted the opportunity to take limited discovery so that it could defend that motion, (D.E. Nos. 19, 26, 28), BEDs ultimately withdrew the motion, (D.E. No. 31), and filed the pending Motion, (D.E. No. 32). Plaintiff filed opposition, (D.E. No. 35; D.E. No. 45, Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss and/or Motion for Partial Summary Judgment ("Pl. Opp. Br.")), and BEDs filed a reply, (D.E. No. 38, Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss and For Partial Summary Judgment as to Count Four ("Def. Reply Br.")).

Because BEDs suggested in their reply that this Court "may" lack subject matter jurisdiction over certain of the claims in this case, (*id.* at 16), the Court ordered the parties to submit supplemental briefing on the issue of subject matter jurisdiction, (D.E. No. 42).  BEDs filed their supplemental letter brief on August 1, 2016, (*see* D.E. No. 47), and Plaintiff filed its brief on August 5, 2016, (*see* D.E. No. 53).

## III.  DISCUSSION

### A.  This Court has Subject Matter Jurisdiction

After considering the parties' respective arguments and authorities cited in the supplemental briefing ordered by this Court, the Court is convinced that it has subject matter jurisdiction over the claims in this case.

As our Supreme Court held in *Peacock v. Thomas*, 516 U.S. 349 (1996)—and as courts in this District have explained—when a plaintiff who has obtained a judgment against a defendant for an ERISA violation seeks, in a subsequent lawsuit, to obtain payment of that prior judgment from a different defendant (*i.e.*, one not involved in the initial suit), the plaintiff may not rely on theories of vicarious liability alone to establish subject matter jurisdiction.  *See Bd. of Trs. of*

*Trucking Emps. of N. Jersey Welfare Fund, Inc. v. Caliber Auto Transfer, Inc.*, No. 09-6447, 2010 WL 2521091, at *9 (D.N.J. June 11, 2010) (discussing *Peacock v. Thomas*); *Operative Plasterers & Cement Masons Int'l Assoc. Local 8 v. AGJ Const., LLC*, No. 08-6163, 2009 WL 4796764, at *2-3 (D.N.J. Dec. 9, 2009) (same).   Instead, a plaintiff must assert an "underlying" ERISA violation in order to establish subject matter jurisdiction.  *Peacock*, 516 U.S. at 354; *Caliber*, 2010 WL 2521091, at *9; *Operative Plasterers*, 2009 WL 4796764, at *3.

> To qualify as a new ERISA claim, the complaint would have had to allege that a third party was either responsible for commission of the original ERISA violation, or that the third party committed a new and distinct ERISA violation.  In the former instance, a third party is "responsible" if it directly committed the original violation or had "common control" over the judgment defendant when the ERISA violation occurred.  An assertion of "common control" must be based on a third party's direct involvement in the ERISA violation at the time of the violation and not based on the third party's vicarious liability derived solely from its relationship to the judgment defendant.

*Operative Plasterers*, 2009 WL 4796764, at *2 (citations omitted).   Indeed, "to plead an independent ERISA claim, [a plaintiff] must do much more than simply assert 'alter-ego' and 'single employer' theories of liability."  *Id.* at *3.

Here, Plaintiff asserts that BEDs were under the common control of Duramix at the time of Duramix's withdrawal.   (*See* Compl. ¶¶ 103-106).   Thus, Plaintiff asserts that BEDs were responsible for, or played a part in, the original ERISA violation.  *See Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 85 F.3d 1282, 1286 (7th Cir. 1996) ("Central States is not pursuing the defendant corporations merely to enforce a judgment.   Rather, Central States is claiming that Central Transport and Central Cartage played a part in the initial ERISA violation. . . . Central States claims that the defendants exercised 'common control,' . . . [which] is a specific claim for relief under ERISA.").   Accordingly, because Plaintiff's Complaint alleges that BEDs were under the common control of Duramix when Duramix violated ERISA, Plaintiff has asserted

an independent ERISA claim, providing this Court with subject matter jurisdiction over that claim. *See Caliber*, 2010 WL 2521091, at *9-10 (determining that the court had subject matter jurisdiction where the plaintiff alleged facts suggesting that non-judgment defendants could have been directly liable for the ERISA violation previously entered against another entity); *see also Cent. States*, 85 F.3d at 1287 ("Central States' claim in the instant lawsuit alleges common control, and the district court therefore properly assumed subject matter jurisdiction.").

Because the Court has federal question jurisdiction over BEDs, the Court may exercise subject matter jurisdiction over such related claims that form a part of the same case or controversy. *Caliber*, 2010 WL 2521091, at *10 (citing 28 U.S.C. § 1367(a)). Therefore, the Court has supplemental jurisdiction over the remaining claims in the Complaint.

### B. Motion to Dismiss[6]

#### 1. <u>Legal Standard</u>

Federal Rule of Civil Procedure Rule 8 requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). That rule has been construed to require that a complaint, to survive dismissal, "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a [party] has acted unlawfully." *Id.*; *see also id.* ("[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an

---

[6] Because, as discussed *infra*, Plaintiff will be permitted to amend its Complaint, the Court declines to address BEDs' arguments for dismissal on Count 4 as to the BEDs who remain following resolution of the Motion for Summary Judgment as discussed herein. In any amended complaint Plaintiff shall re-plead Count 4 against those remaining BEDs in a manner consistent with Rule 8 and this Opinion. Those remaining BEDs are free to renew any ground for dismissal upon the filing of any amended complaint.

unadorned, the-defendant-unlawfully-harmed-me accusation." (quoting *Twombly*, 550 U.S. at 555)). Notably, the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the nonmoving party. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). But the court is not required to accept "legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted).

The Court's inquiry is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). In its evaluation, the Court properly considers the complaint, documents attached to or submitted with the complaint, matters incorporated by reference or integral to the claims, matters of which the Court may take judicial notice, matters of public record, orders, and other items of record in the case. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

## 2. Plaintiff's Count 1 for Withdrawal Liability Against BEDs Must Be Dismissed

Count 1 of Plaintiff's Complaint alleges withdrawal liability against all the defendants, including BEDs. (Compl. ¶¶ 51-60). BEDs assert that Count 1 "must be dismissed for failure to state a claim on the basis that withdrawal liability has already been determined." (D.E. No. 32-3, Defendants' Memorandum of Law in Support of Their Motion to Dismiss and for Partial Summary Judgment ("Def. Mov. Br.") at 30). In opposition, Plaintiff argues that withdrawal liability against BEDs has not yet been adjudicated, and that BEDs' own cited authorities demonstrate that Plaintiff can "seek to recoup" withdrawal liability from the BEDs. (*See* Pl. Opp. Br. at 26-28). BEDs respond that "asserting a direct claim for withdrawal liability against [BEDs]" is an inappropriate

vehicle to "recoup withdrawal liability," (Def. Reply Br. at 15), and that this action properly should be construed as a "judgment enforcement action," (*id.* at 11).

The notion that Plaintiff may sue BEDs—directly—for withdrawal liability already adjudicated against Duramix appears illogical on its face.  Leaving aside "alter ego," "single employer," "common control," or any similar theory for which Plaintiff might seek to recover from BEDs, a claim for withdrawal liability against BEDs necessarily must assert the required elements of withdrawal liability:  that BEDs were "employers" within the meaning of ERISA, that BEDs were members of "a multiemployer plan," that BEDs withdrew, and that BEDs now owe withdrawal liability.  *See* 29 U.S.C. § 1381.  The Complaint presently does not state a claim for withdrawal liability against the BEDs.  For example, Plaintiff alleges that *Duramix*, not BEDs, was "signator[y] to the Collective Bargaining Agreements" in this case, and that *Duramix*, not BEDs, "permanently ceased operations and ceased to have an obligation to remit . . . contributions to the Pension Fund," (Compl. ¶¶ 52, 53).

And, the Court is highly skeptical that Plaintiff could ever state such a claim.  Plaintiff's withdrawal liability claim against BEDs seeks a judgment already owed by Duramix.  BEDs cannot be liable as the withdrawing employer—that is, the employer that had the obligation to contribute to the Pension Fund and subsequently withdrew—when Duramix has already been adjudged to be the withdrawing employer.

Furthermore, Plaintiff has pleaded a claim for controlled-group liability in Count 4, which is, in effect, Plaintiff's assertion that BEDs were the same employer as Duramix when Duramix withdrew from the Pension Fund.  Accordingly, Count 1 is duplicative, as that controlled-group count already asserts that BEDs are directly liable for the withdrawal.  *See Flying Tiger Line v. Teamsters Pension Trust Fund of Phila.*, 830 F.2d 1241, 1244 (3d Cir. 1987) ("Since a controlled

group is to be treated as a single employer, each member of such a group is liable for the withdrawal of any other member of the group.").

Plaintiff cites to one case in support of Count 1's continued viability: *Caliber*, where the plaintiff pension fund sought to recover withdrawal liability from entities allegedly under common control with and alter egos of Caliber Auto Transfer, which had already had a default judgment entered against it on that withdrawal liability in a prior suit. *See* 2010 WL 2521091, at *2-4; *see also id.* at *17 ("The Court will begin by determining whether the Plaintiffs are precluded from bringing their withdrawal liability claim against the other defendants based on the [prior] judgment . . . , which granted default judgment for withdrawal liability . . . ."). *Caliber* is not on point; the court there was tasked with determining whether the withdrawal liability claim was precluded under the doctrine of claim preclusion, not whether a plaintiff may assert a direct action for withdrawal liability against certain entities when the same claim has already been adjudicated. *See id.* at * 18-19.

The Court is not persuaded by *Caliber* or Plaintiff's arguments that Count 1 is permissible. Moreover, the Court's own research reveals no case where a Plaintiff has successfully asserted a direct withdrawal liability action against a party when a judgment on the same withdrawal liability had been previously entered against another party. Therefore, because Count 1 of Plaintiff's Complaint fails to state a claim, it is dismissed *with prejudice* as against BEDs.

### 3.  Plaintiff's Count 2 for Single Employer/Alter Ego Liability Must Be Re-Pleaded

Count 2 of the Complaint seeks to hold BEDs liable through use of single-employer and alter-ego theories of liability. As an initial matter, the Court agrees with BEDs' assertion that "single employer" and "alter ego" are distinct doctrines. (*See* Def. Reply Br. at 18-22). The two

theories are derived from different sources of law, require the satisfaction of different elements to establish liability, and focus on different organizational dynamics.

The single-employer doctrine "was developed in the labor law context" in order "to determine whether separate companies should be considered one employer for purposes of the National Labor Relations Act." *Gov't Dev. Bank for Puerto Rico v. Holt Marine Terminal, Inc.*, No. 02-7825, 2011 WL 1135944, at \*18-19 (E.D. Pa. Mar. 24, 2011). The test "looks to whether 'two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a "single employer."'" *Id.* at 18 (quoting *N.L.R.B. v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1122 (3d Cir. 1982)). To determine the existence of a "single integrated enterprise" that should be considered a "single employer," four factors are analyzed: "(1) functional integration of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership." *Id.* (citing *Browning-Ferris Indus.*, 691 F.2d at 1122). "The heart of the inquiry is whether separate corporations are 'in truth . . . but divisions or departments of a single enterprise' lacking the 'arm's length relationship found among unintegrated companies.'" *Id.* (quoting *Browning-Ferris Indus.*, 691 F.2d at 1122).

The alter-ego doctrine, by contrast, is a creature of federal common law, and "is a tool of equity, whose purpose 'is to prevent an independent corporation from being used to defeat the ends of justice, to perpetrate fraud, to accomplish a crime, or otherwise to evade the law.'" *Id.* at \*30 (quoting *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 171 (3d Cir. 2002)).

> In determining whether to disregard the corporate form, the . . . Third Circuit has considered the following factors . . . : gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records,

and whether the corporation is merely a facade for the operations of the dominant stockholder.

*Id.* (quoting *Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003)).

Plaintiff's Complaint seeks to assert these two distinct theories under the same count. Plaintiff alleges that BEDs' "interrelation of operations, common management and ownership and centralized control of labor relations constitute a single integrated enterprise making them a single employer and/or alter egos being jointly and severally liable for this withdrawal liability." (Compl. ¶ 63). Those allegations repeat the elements of the single-employer test. *See Browning-Ferris Indus.*, 691 F.2d at 1122.

Plaintiff proceeds, under the same count, to allege facts that go to establishing the alter-ego doctrine. (*See* Compl. ¶¶ 66-87). Indeed, the Complaint contains separate sections under Count 2 for "gross undercapitalization," "failure to observe business entity formalities," "siphoning of funds of the debtor corporation by the dominant officers and/or directors," "insolvency of the debtor corporation," "non-functioning of officers/directors," "absence of business entity records," and "corporation merely a façade for the operation of dominant shareholder." (*See id.*).

As a practical matter, Plaintiff's Complaint must be re-pleaded. To the extent Plaintiff seeks to hold BEDs liable under both a single-employer theory and an alter-ego theory, those theories must be pleaded in separate counts.

Moreover, Plaintiff's Complaint fails to state a claim under the single-employer theory. No facts in the Complaint suggest that the BEDs and Duramix shared a "centralized control of labor relations," and the allegations supporting "interrelation of operations" are thinly pleaded, at best. To be sure, Plaintiff alleges some facts to suggest that Duramix, Bayonne Durable, and

Durable Recycling had an interrelation of operations,[7] but the Court does not find it reasonable to draw the inference that an interrelation of operations as to those three defendants establishes that Duramix and the other thirty-seven BEDs had an interrelation of operations.

On the other hand, the Court finds that Plaintiff states a claim under an alter-ego theory of liability. Although only four of the defendant companies are specifically named in the Complaint, the specific allegations as to Duramix, AOM, Bayonne Durable, and Durable Recylcling, along with the numerous allegations as to the ownership of Duramix and BEDs, informal lending between Duramix and BEDs, and offices and equipment shared by Duramix and BEDs, (*see id.* ¶¶ 23, 30, 35-37, 43, 47-49), permit the Court to draw the reasonable inference that BEDs could be liable as alter egos for Duramix's withdrawal liability.

Accordingly, Count 2 of the Complaint, while stating a claim for alter-ego liability, must be re-pleaded to the extent that Plaintiff seeks to assert a single-employer theory of liability.[8] To

---

[7] For example, Plaintiff asserts that Duramix provided "concrete to various entities, including Bayonne Durable . . . , Durable Recycling, . . . as well as to various real estate entities in the . . . Enterprise and which concrete was used in construction and real estate development of the various locations owned and operated by the real estate entities of the . . . Enterprise." (Compl. ¶ 38). Plaintiff also asserts that "[a] considerable operational network existed among and between Duramix, Bayonne Durable . . . , and Durable Recycling . . . , in which Duramix provided trucking and concrete for the other entities. In return, Bayonne Durable . . . transported sand to Duramix for use in the concrete plant. Duramix also provided concrete to Bayone Durable . . . for use of its various construction projects instead of paying rent to Bayonne Durable . . . for use of the concrete plant." (*Id.* ¶ 49).

[8] The Court notes that "the 'single employer' doctrine has not been adopted by the Third Circuit in the context of ERISA." *Holt*, 2011 WL 1135944, at *20; *see also Lafata v. Raytheon Co.*, 147 F. App'x 258, 262 (3d Cir. 2005) ("We need not consider whether this 'single employer' doctrine is applicable in the context of a federal employment statute like ERISA where employer participation is voluntary."). While making no determination as to the viability of the doctrine under ERISA, the Court notes that Plaintiff should be guided accordingly in determining whether to bring a single-employer claim in any amended complaint.

Further, it is unclear whether Plaintiff's alter-ego theory is attempting to hold some BEDs liable as alter egos of other BEDs that are allegedly under common control with Duramix, or whether Plaintiff is seeking to hold all BEDs liable as alter egos of Duramix. But the Court cautions Plaintiff, in any event, to be mindful of *Brown v. Astro Holdings, Inc.*, wherein the court stated "that the MPPAA permits a plaintiff to bring a claim for alter ego liability alleging that a defendant is the alter ego of the *statutory employer*. . . . [But] the MPPAA will not permit a plaintiff to bring a claim for alter ego liability alleging that a defendant is the alter ego of a trade or business *'under common control' with a statutory employer*." 385 F. Supp. 2d at 532 (emphasis added). That is because "common control" is defined in the MPPAA in a manner that sets out a "seemingly comprehensive" list of just what entities may be deemed under common control, and "allowing liability to be imposed on an alter ego of an entity 'under common control' would effectively add another, overlapping category to the existing list." *Id.* Indeed, seeking to hold a defendant liable as an alter ego of another defendant under common control with the statutory employer—rather than seeking to

be clear, should Plaintiff choose to assert both single-employer and alter-ego theories, those theories must be asserted in separate counts.

### 4.   Count 5 Fails to State a Claim for "Avoid and Evade" Liability

Count 5 of the Complaint alleges "avoid and evade" liability against BEDs.  The Court finds that Plaintiff's Complaint, as pleaded, fails to state a claim.

As an initial matter, Plaintiff asserts the incorrect section of ERISA as the basis for Count 5.  Plaintiff alleges that BEDs "engaged in multiple sham transactions, in violation of ERISA, § 4069, 29 U.S.C. § 1369(a), the purpose of which transactions were [sic] to avoid and evade . . . withdrawal liability."  (Compl. ¶ 104).  As BEDs correctly point out, section 1369(a) governs *single-employer* plans, (Def. Mov. Br. at 24 (citing *Caliber*, 2010 WL 2521091 at *25 n.8)); thus, that section is inapplicable here because, as noted previously, this matter concerns a multi-employer employee benefit plan.  (*See also* Compl. ¶ 9).  Although Plaintiff concedes in its opposition brief that the Complaint's citation to section 1369 "was inaccurate" and "the proper statutory citation for [Count 5] is 29 U.S.C. § 1392," (Pl. Opp. Br. at 23), "[i]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss," *Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (citation and internal quotation marks omitted).  Accordingly, Count 5 fails to state a claim as pleaded.

Even if Plaintiff had asserted section 1392 as the source for which it seeks to hold BEDs liable, the Complaint would fail as pleaded.  To state a claim for avoid-and-evade liability under ERISA, a plaintiff must allege that "a contributing employer enter[ed] a transaction with a principal purpose of escaping its duty to pay withdrawal liability to the plan or fund."

---

hold a defendant liable as an alter ego of the statutory employer itself—would seem to run afoul of our Supreme Court's observation that ERISA's "carefully crafted and detailed enforcement scheme provides 'strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.'"  *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) (citation omitted).

*SUPERVALU, Inc. v. Bd. of Trs. of Sw. Pa. & W. Md. Area Teamsters & Emps. Pension Fund*, 500 F.3d 334, 341 (3d Cir. 2007).  Of course, such allegations must meet the requirements of Rule 8, as interpreted by our Supreme Court in *Iqbal* and *Twombly*.  Plaintiff's allegations as to avoid-and-evade liability fail to do so.

The Court finds that the following allegations reasonably relate to Count 5:

- "The respective ownership percentages of the [BEDs] were coordinated and manipulated in efforts to avoid IRS regulations, as well as in efforts to insulate various [BEDs] from financial and legal obligations, including the withdrawal liability owed to the Plaintiff, Pension Fund."  (Compl. ¶ 40).

- "At some point in 2012 or 2013, Vincenzo Alessi and Susan Alessi made significant changes to the various shares and/or ownership percentages held by numerous entities in the Alessi Family Enterprise.  While such changes in shares held and ownership percentages were described as part of estate planning efforts by Susan Alessi and Vincenzo Alessi, such changes were part of the [BEDs'] efforts to insulate them from financial and legal obligations, including the withdrawal liability owed to the Plaintiff, Pension Fund." (*Id.* ¶ 46).

- "[BEDs] created separate business entities to fragment ownership of various assets in the Alessi Family Enterprise and to insulate the [BEDs] comprising the Alessi Family Enterprise from financial and legal obligations as the withdrawal liability owed to the Pension Fund.  These [BEDs] were created as facades for the operation of the dominant shareholders and dominant member, Vincenzo Alessi, and for the integrated operations of the entire Alessi Family Enterprise."  (*Id.* ¶ 87).

- "Both prior to the Pension Fund Assessing withdrawal liability against Duramix, as well as since the assessment, [BEDs] engaged in multiple sham transactions, in violation of ERISA, § 4069, 29 U.S.C. § 1369(a), the purpose of which transactions were to avoid and evade the withdrawal liability that would be, and that eventually was assessed against Duramix upon its withdrawal from the Pension Fund."  (*Id.* ¶ 104).

- "Vincenzo Alessi, by and through various [BEDs], prevented Duramix from posting profits and diverted monies to paying repaying [sic] loan obligations owed to other [BEDs], and which monies should have been properly applied to satisfy the withdrawal liability assessed against Duramix.  (*Id.* ¶ 105).

- "Upon information and belief, the manner in which Vincenzo Alessi determined [BEDs'] ownership shares and percentages for each of the control group members, and transfers of ownership shares and percentages indicate that Vincenzo Alessi and members of the [BEDs'] control group were attempting to avoid and evade the payment of withdrawal liability as defined in 29 U.S.C. § 1391." (*Id.* ¶ 106).

17

Notably, nowhere in the Complaint—as evidenced by the above paragraphs—does Plaintiff identify a single "sham transaction," nor does Plaintiff allege a single specific BED that engaged in manipulation or recalculation of shares or percentages of another BED, nor does Plaintiff offer an example of what type of manipulation of shares or sham transactions took place that evince a "principal purpose" of avoiding or evading the BEDs' alleged duty to pay withdrawal liability.  Simply put, the Complaint alleges no facts from which this Court can draw the reasonable inference that BEDs are liable for avoiding and evading liability.  *See Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556).

Instead, Plaintiff's Complaint offers conclusory statements, "naked assertions devoid of further factual enhancement," and "an unadorned, the-defendant-unlawfully-harmed me accusation[s]," which present nothing "more than a sheer possibility" that BEDs avoided and evaded their alleged duty under ERISA.  *See id.* at 678 (citations omitted).  Accordingly, Count 5 of Plaintiff's Complaint fails to state a claim and is dismissed.  But because it is possible for Plaintiff to amend its Complaint to correct the deficiencies identified above, Count 5 is dismissed *without prejudice*.  *See Phillips*, 515 F.3d at 245 ("[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile.").[9]

---

[9] BEDs assert that Plaintiff's avoid-and-evade claim has been waived because Plaintiff failed to bring the dispute during arbitration.  (Def. Mov. Br. at 24-25).  The Court disagrees for two reasons.  First, as Plaintiff certifies, it was not aware of the viability of an avoid-and-evade claim until long after the arbitration in this case occurred.  (D.E. No. 35-1, Certification of Matthew G. Connaughton ¶¶ 3-7).  Plaintiff could not have waived an issue of which it was not aware.  Second, the case law in this area establishes that the question whether an entity was ever under common control with the contributing employer is a question to be decided by the courts.  *See Doherty v. Teamsters Pension Trust Fund of Phila. & Vicinity*, 16 F.3d 1386, 1390-91 (3d Cir. 1994), *as amended on reh'g* (Mar. 17, 1994).  Here, BEDs dispute their status as members of a controlled group, and the issue of their status as alleged controlled-group members has not been fully adjudicated.  Accordingly, it is not clear that BEDs were ever MPPAA employers under common control with Duramix, which question requires adjudication by the courts, not arbitration.

### 5. <u>Count 6 of the Complaint for "Clawback Liability" Fails to State a Claim</u>

In Count 6 of the Complaint, Plaintiff asserts "clawback liability," which is Plaintiff's attempt to "recoup any and all amounts paid to Gaetano Alessi, Jr. and Salvatore Alessi from Vincenzo Alessi and from [BEDs]" as part of an apparent settlement in another action. (Compl. ¶¶ 109, 110, 115). Plaintiff alleges that as part of the settlement, Duramix bought the shares of Duramix stock owned by Gaetano Alessi, Jr. and Salvatore Alessi. (*Id.* ¶ 110). "In return for settling the underlying civil action and for selling their shares back to Duramix, Vincenzo Alessi and the [BEDs] agreed to pay approximately $6,000,000.00-$8,000,000.00 to Gaetano Alessi, Jr. and Salvatore Alessi." (*Id.* ¶ 112). Allegedly, the payment to Gaetano Alessi, Jr. and Salvatore Alessi continues at present, and, to facilitate the payment, "various business entities and assets of various business entities in the Alessi Family Enterprise were transacted or otherwise liquidated by Vincenzo Alessi and by the [BEDs] comprising the Alessi Family Enterprise." (*Id.* ¶ 113). But, Plaintiff alleges, "as a single employer and/or alter ego[] of Duramix, funds used to satisfy the terms of the settlement should have been allocated to satisfying the outstanding and unpaid withdrawal liability owed to the Pension Fund." (*Id.* ¶ 114). Plaintiff does not cite to any statutory authority on which it might base its claim under Count 6. (*See id.* ¶¶ 107-115).

BEDs argue that a cause of action for "clawback liability" does not exist in the context of withdrawal liability. (Def. Mov. Br. at 28-29). Further, BEDs point out that "the only references to 'clawback' in the context of ERISA are those referring to . . . a clawing-back of expenses already paid out to a plan participant, or specific provisions that might be found in a plan regarding 'clawing back.'" (*Id.* at 28 (citations omitted)).

A review of the case law cited by BEDs confirms this. *See, e.g.*, *Elliot v. Elliot, Leibl, & Snyder, LLP Long Term Disability Plan*, 450 F. App'x 637, 638-39 (9th Cir. 2011) (discussing

19

insurance company's 2006 efforts to "claw back" benefits paid to benefit plan participant after recalculating the benefits that should have been paid between 2003 and 2006); *Waschak v. The Acuity Brands, Inc. Senior Mgmt. Benefit Plan*, 384 F. App'x 919, 921 (11th Cir. 2010) (discussing a benefit plan's attempt to "claw back" allegedly overpaid funds by reducing future payments to the allegedly overpaid plan participant).

Additionally, this Court's independent research has revealed no cases permitting a cause of action to "clawback" funds in circumstances such as these, where a plaintiff asserts that certain funds should have been allocated to the plaintiff to satisfy withdrawal liability but were instead wrongfully paid to another party. Indeed, the Court cannot determine whether Plaintiff has stated a sufficient cause of action under Count 6 because it is unaware of what elements must be pleaded to state such a cause of action.

Tellingly, Plaintiff does not cite a single case in its opposition brief that has permitted a cause of action for "clawback liability" in the context of withdrawal liability under ERISA. (*See* Pl. Opp. Br. at 25-26). In fact, Plaintiff does not cite any case at all in its opposition to BEDs' Motion to Dismiss Count 6. (*See id.*). Instead, Plaintiff states that "[n]either ERISA, [the Multi-Employer Pension Plan Amendments Act ("MPPAA")] nor equitable considerations permit a judgment defendant to actively divert funds owed to creditors . . . and to use such diverted funds for other purposes such as for proceeds paid in a settlement agreement." (*Id.* at 26). And, Plaintiff argues that "29 U.S.C. § 1132(a)(1)(B) and (g)(2)(E) provide the statutory basis for the utilization of equitable principles in recouping withdrawal liability sought in this matter." (*Id.*).

Leaving aside that a plaintiff may not amend or supplement the Complaint by way of its opposition brief, *Swift v. Pandey*, No. 13-649, 2013 WL 6022093, at *2 (D.N.J. Nov. 13, 2013) (citing *Zimmerman*, 836 F.2d at 181), Plaintiff's argument is unavailing. Nothing in 29 U.S.C. §

20

1132(a)(1)(B) or (g)(2)(E)[10] speaks to a party's right or ability to recoup funds that allegedly should have been reserved to satisfy withdrawal liability but have already been dispersed pursuant to a settlement agreement. Notwithstanding that this Court may award "such . . . legal or equitable relief" it deems to be appropriate in a given ERISA case, *see* 29 U.S.C. § 1132(g)(2)(E), the Court is unpersuaded that a cause of action for "clawback liability" exists in the realm of withdrawal liability under ERISA. Accordingly, Count 6 of the Complaint is dismissed *with prejudice* for failure to state a claim.

### C. Motion for Partial Summary Judgment

Count 4 of Plaintiff's Complaint alleges that BEDs are responsible for Duramix's withdrawal liability because BEDs were under the "common control" of Duramix. (*See* Compl. ¶¶ 99-102). BEDs move for summary judgment on Count 4. (Def. Mov. Br. at 17). For the following reasons, BEDs' Motion is GRANTED in part and DENIED in part.

### 1. <u>Legal Standard</u>

Pursuant to Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the role of the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A factual dispute is genuine if a reasonable jury could find in favor of the nonmoving party and it is material only if it bears on an essential element of the plaintiff's claim.

---

[10] 29 U.S.C. § 1132(a)(1)(B) states: "A civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

29 U.S.C. § 1132(g)(2)(E) states: "In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan . . . such other legal or equitable relief as the court deems appropriate."

*Fakete v. Aetna, Inc.*, 308 F.3d 335, 337 (3d Cir. 2002).  In determining whether a genuine issue of material fact exists, a court must consider all facts and their reasonable inferences in the light most favorable to the nonmovant.  *See Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

The party moving for summary judgment must show, first, that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to present evidence that a genuine issue of material fact compels a trial.  *Id.* at 324.  In opposing summary judgment, the nonmoving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The nonmoving party may not rest upon the mere allegations or denials in its pleadings.  *See Celotex*, 477 U.S. at 324.  Furthermore, the nonmoving party cannot rely on speculation and conclusory allegations to defeat summary judgment.  *Ridgewood Bd. of Educ. v. N.E. ex rel M.E.*, 172 F.3d 238, 252 (3d Cir. 1999).  In any event, even where no genuine issue of material fact exists, "[a] motion for summary judgment may not be granted unless the moving party is entitled to judgment as a matter of law."  *Milton v. Ray*, 301 F. App'x 130, 132 (3d Cir. 2008).

### 2.  **Substantive Legal Standard - Controlled Group Liability Under ERISA**

ERISA, as amended by the MPPAA, permits the trustees of a pension plan to assess "withdrawal liability" against an employer that "prematurely ceases making payments into" the plan.  *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.-Pension Fund v. Kero Leasing Corp.*, 377 F.3d 288, 294 (3d Cir. 2004) (citing 29 U.S.C. § 1381(b)(1)).  "The MPPAA extends responsibility for payment of withdrawal liability beyond the withdrawing employer to 'all employees of trades or businesses (whether or not incorporated) which are under common control.'"  *Id.* at 295 (quoting 29 U.S.C. § 1301(b)(1)).  "Since a controlled group is to be treated

as a single employer, each member of such a group is liable for the withdrawal of any other member of the group." *Flying Tiger Line*, 830 F.2d at 1244 (citing *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127-28 (3d Cir. 1986)).

The MPPAA employs the Internal Revenue Code's ("IRC") "controlled group" standards to determine whether entities are under common control and thus liable as a single employer.[11] *See id.* at 1244 & n.2 (quoting 29 U.S.C. § 1301(b)(1); citing *Barker & Williamson*, 788 F.2d at 123).

Pursuant to IRC regulations, three types of controlled groups exist: "(1) parent-subsidiary; (2) combined; and (3) brother-sister." *I.A.M. Nat. Pension Fund v. TMR Realty Co.*, 431 F. Supp. 2d 1, 11-12 (D.D.C. 2006) (citing 26 C.F.R. § 1.414(c)-2). A brother-sister controlled group exists "if the same five or fewer people own both a *controlling interest* in, and *effectively control* the same group of businesses." *Id.* at 12 (citing 26 C.F.R. § 1.414(c)-2(c)).[12]

---

[11] The MPPAA

> itself does not define "under common control," but instead authorizes the Pension Benefit Guaranty Corporation ("PBGC") to issue regulations defining 'common control' that are to be "consistent and coextensive with" regulations promulgated by the Treasury Department under section 414(c) of the Internal Revenue Code ("IRC"), 26 U.S.C. § 414(c). The PBGC has issued the authori[z]ed regulations, codified at 29 C.F.R. §§ 4001.1-4001.3, which incorporate by reference regulations defining "common control" issued by the Internal Revenue Service pursuant to IRC § 414(c), codified at 26 C.F.R. §§ 1.414(c)-1 to 1.414(c)-5.

*Brown*, 385 F. Supp. 2d at 528 (citing *Barker & Williamson, Inc.*, 788 F.2d at 123).

[12] The Court agrees with BEDs that neither a "parent-subsidiary" nor a "combined" controlled group is at issue in this case. (*See* Def. Mov. Br. at 16 n.2). And, Plaintiff does not dispute that a brother-sister relationship is the relevant controlled group in this matter. Indeed, both "parent-subsidiary" and "combined" controlled groups require a common parent organization. *TMR Realty Co.*, 431 F. Supp. 2d at 12 ("[T]he regulations provide that a 'parent-subsidiary' group includes any entity in a chain if each entity in the chain is owned, directly or indirectly, by a common parent with a *controlling interest.*" (citing 26 C.F.R. § 1.414(c)-2(b))); *N.Y. State Teamsters Conference Pension & Ret. Fund ex rel. Bulgaro v. Doren Ave. Assocs., Inc.*, 321 F. Supp. 2d 435, 445 n.8 (N.D.N.Y. 2004) ("[A] 'combined group consist[s] of 'any group of three or more organizations,' if (1) each such organization is a member of either a parent-subsidiary group . . . or a brother-sister group . . . , and (2) at least one such organization is the common parent organization of a parent-subsidiary group . . . and is also a member of a brother-sister group." (quoting 26 C.F.R. § 1.414(c)-2(d))), *aff'd sub nom. N.Y. State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640 (2d Cir. 2005). It is undisputed that Duramix has, since its inception, been owned by some combination of individuals and not by any organizations. (*See* BED SMF ¶ 6; Alessi Dec. ¶ 10 & Ex. A; Pl. SMF ¶ 6).

23

In the case of a corporation, "a 'controlling interest' is defined to constitute ownership of 80% o[r] more (by value or voting power) of the corporation's stock." *Id.* (citing 26 C.F.R. § 1.414(c)-2(b)(2)(A)).  "In the case of a partnership, a controlling interest is defined as 'ownership of at least 80 percent of the *profits* interest or *capital* interest of such partnership." *Local 478 Trucking & Allied Indus. Pension Fund v. Jayne*, 778 F. Supp. 1289, 1303 (D.N.J. 1991) (quoting C.F.R. § 1.414(c)-2(b)(2)(C)).

As for the "effective control" element, in the case of a corporation, "'[e]ffective control' is defined under the regulations as ownership of more than 50% (by value or voting power) of the corporation's stock." *TMR Realty Co.*, 431 F. Supp. 2d at 12 (citation omitted).  In the case of a partnership, to satisfy the "effective control" part of the common-control test, "persons must own an aggregate of more than fifty percent of the profits interest or capital interest of the partnership." *Jayne*, 778 F. Supp. at 1304 (citing 26 C.F.R. § 1.414(c)-2(c)).

"ERISA defines an employer to include businesses under 'common control' *with the actual employer on the withdrawal date.*"  *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc. - Pension Fund v. Centra*, 983 F.2d 495, 502 (3d Cir. 1992) (emphasis added).

### 3.   Whether a Dispute Exists as to Material Facts in this Matter

BEDs submitted a Statement of Material Facts not in dispute pursuant to Local Civil Rule 56.1(a).  (*See* D.E. No. 46, Statement of Material Facts ("BED SMF")).  Plaintiff submitted a Responsive Statement of Material Facts as required by the same Rule.  (*See* D.E. No. 54, Responsive Statement of Material Facts ("Pl. SMF")).

Plaintiff does not dispute any material facts.  So, the Court does not discuss the single dispute raised by Plaintiff in its Responsive Statement of Material Facts.  (*See id.* ¶ 5).

As for undisputed material facts, crucial to the resolution of BEDs' Motion for Summary Judgment on Count 4 is BEDs' list of the formation dates of each BED as well as Duramix's formation date. (BED SMF ¶ 1). Equally important is BEDs' catalogue of "the ownership structures of each of the [BEDs] . . . in Exhibit A to the Declaration of Vincenzo Alessi." (*Id.* ¶ 6 (citing Alessi Dec. ¶ 10 & Ex. A)). Notably, Plaintiff does not dispute any of the facts presented in the formation date list or the document detailing BEDs' ownership structures. (*See* Pl. SMF ¶¶ 1, 6).

Also undisputed by Plaintiff is BEDs' assertion that, from its inception in 1999 through October 2009, Duramix was owned in equal 20% shares by Vincenzo Alessi, Francesco Alessi, Nancy Alessi, Gaetano Alessi, Jr., and Salvatore Alessi. (BED SMF ¶ 2; Pl. SMF ¶ 2). In October 2009, Gaetano Alessi, Jr., and Salvatore Alessi "were bought out, and ownership changed" such that Vincenzo Alessi, Francesco Alessi, and Nancy Alessi each owned 33.33% of Duramix. (BED SMF ¶ 2; Pl. SMF ¶ 2).

Finally, although not appearing in either Plaintiff's or BEDs' respective statement of facts, the parties appear to agree that a genuine dispute of material fact exists as to the "trades or businesses" status of six BEDs. (See Pl. Opp. Br. at 17-22; Def. Reply Br. at 9-10 ("Defendants will concede that, at this stage, there are open questions of fact . . . .")). That dispute precludes summary judgment against those six BEDs. *See Celotex*, 477 U.S. at 323.

### 4. **BEDs' Motion for Summary Judgment is Granted in Part and Denied in Part**

#### i. *Certain BEDs are Entitled to Summary Judgment on Count 4*

BEDs argue that the basic formation dates and ownership structures of BEDs and Duramix require summary judgment in favor of thirty-three of the thirty-nine BEDs. (Def. Mov. Br. at 17-18; Def. Reply Br. at 9-10). The Court agrees that many of the BEDs are entitled to summary

judgment on Count 4 of the Complaint, but the number of BEDs so entitled is thirty, not thirty-three.

Plaintiff alleges that BEDs "were all trades and/or businesses under common control," (Compl. ¶ 100), and, thus, that BEDs are liable for Duramix's withdrawal liability. Accordingly, whether BEDs were part of a controlled group is determined by using the ownership structure of Duramix as the baseline. *See Centra*, 983 F.2d at 502 (noting that an employer includes businesses under common control "with the *actual employer*" (emphasis added)); *McDougall v. Pioneer Ranch Ltd. P'ship*, 494 F.3d 571, 577 (7th Cir. 2007) ("To impose withdrawal liability on an organization other than the one obligated to the Fund . . . the organization must be under 'common control' with the *obligated organization* . . . ." (citation omitted and emphasis added)). That is, to satisfy the controlling interest element of the brother-sister common control test, the Court must determine whether the BEDs were 80% owned by the same five or fewer people who owned 80% of Duramix—the actual, withdrawing employer. The undisputed facts show that only thirty of the thirty-nine BEDs could possibly have been part of a controlled group on the date of Duramix's withdrawal, February 19, 2010.

### a. *BEDs that could not have been part of a controlled group because of formation date*

Entities that were formed after the date of the obligated employer's withdrawal cannot be under common control with that obligated employer. *Teamsters Pension Tr. Fund of Phila. v. Brigadier Leasing Assocs.*, 880 F. Supp. 388, 396 (E.D. Pa. 1995) ("The Court agrees with defendants that a MPPAA employer's relationship with other trades or businesses following withdrawal is not relevant to withdrawal liability. Withdrawal liability is imposed only on those trades and businesses that are under common control with the withdrawing employer on the date

of withdrawal.  A trade or business that becomes part of a controlled group with the employer *after* the withdrawal has no obligation to contribute and is never a contributing MPPAA employer."); *see also Centra*, 983 F.2d at 502; *Barker & Williamson*, 788 F.2d at 123 (noting that, for controlled group liability, a court must examine ownership as of the date of withdrawal).  Accordingly, several of the BEDs cannot be part of an alleged controlled group that would be responsible for Duramix's withdrawal liability for the simple reason that they were formed *after* February 19, 2010, the date of Duramix's withdrawal.

The following ten BEDs are therefore entitled to judgment as a matter of law on Count 4 of Plaintiff's Complaint:

- 160 East 22nd Street Realty, LLC (formed in December 2013)
- 195 East 22nd Street Urban Renewal, LLC (formed in December 2013)
- 16-18 West 32nd Street, LLC (formed in December 2012)
- 19th Street Associates, LLC (formed in November 2014)
- 458-460 Broadway, LLC (formed in December 2012)
- 662 Ave. C Urban Renewal, LLC (formed December 2013)
- Blue Circle Equity Advisors, LLC (formed in March 2013)
- Blue Circle Terminals, LLC (formed in March 2013)
- Durametal Management LLC (formed in July 2013)
- West 6th Street Realty, LLC (formed in December 2013)

(BED SMF ¶ 1; Pl. SMF ¶ 1).  Count 4 of Plaintiff's Complaint is dismissed *with prejudice* as to the above ten BEDs.

**b.  *BEDs that could not have been part of a controlled group because of ownership structure***

As previously noted, from its inception in 1999 through October 2009, Duramix was owned in equal 20% shares by Vincenzo Alessi, Francesco Alessi, Nancy Alessi, Gaetano Alessi, Jr., and Salvatore Alessi.  (BED SMF ¶ 2; Pl. SMF ¶ 2).  In October 2009, Gaetano Alessi, Jr., and Salvatore Alessi "were bought out, and ownership changed" such that Vincenzo Alessi, Francesco Alessi, and Nancy Alessi each owned 33.33% of Duramix.  (BED SMF ¶ 2; Pl. SMF ¶ 2).  So, for

there to be any possibility of any BED qualifying as a member of a controlled group, that BED would have to be at least 80% owned by 3 or 4 of the Duramix owners, depending on the Duramix ownership structure used (*i.e.*, pre-October 2009 or post-October 2009).

Specifically, if using the pre-October 2009 Duramix ownership structure as the baseline, to qualify as a member of a controlled group, a BED would have to have been owned on February 19, 2010 (the withdrawal date) by at least four of Vincenzo, Francesco, Nancy, Gaetano, Jr., and Salvatore Alessi.  Additionally, those four must have owned at least 80% of the particular BED. That is because prior to October 2009, Duramix—the withdrawing employer—was owned in equal 20% shares by Vincenzo, Francesco, Nancy, Gaetano, Jr., and Salvatore Alessi.  Four owners of Duramix who each own 20% constitute a controlling interest (80%) in Duramix.  Thus, using the pre-October 2009 Duramix ownership structure as the baseline, a BED must have been 80% owned by at least four of the pre-October 2009 Duramix owners in order for that BED to have been owned by "the same five or fewer people" with a "controlling interest."

If using the post-October 2009 Duramix ownership structure as the baseline, a BED would have to have been owned by Vincenzo, Francesco, and Nancy Alessi on February 19, 2010.  That is because Duramix, post-October 2009, was owned in equal 33.33% shares by Vincenzo, Francesco, and Nancy Alessi.  Those three owners had a controlling interest in Duramix (*i.e.*, 33.33% each equals ownership greater than 80%).  Thus, using the post-October 2009 Duramix ownership structure as the baseline for determining controlled-group membership of the BEDs, a BED must have been owned by all three post-October 2009 Duramix owners.  A BED owned by only Vincenzo and Francesco Alessi, for example, would not be owned by the "same five or fewer people," and thus would fail the common control test.

28

The following twenty BEDs could not have been part of a controlled group with Duramix on the date of its withdrawal because they did not have the required same five or fewer owners. The ownership listed for each BED reflects the undisputed ownership on the date of Duramix's withdrawal:

- 50 Oak Street Realty, LLC - owned by Gaetano Alessi, Sr.
- 52nd Street Associates, LLC - owned by Vincenzo Alessi, Francesco Alessi and Rocky Aversa[13]
- Alessi Organization Management Limited Liability Company - owned by Vincenzo Alessi and Susan Alessi
- Atlantic Cement Realty, LLC - owned by Vincenzo Alessi and Susan Alessi
- Bayonne Trailer Park Associates, LLC - owned by Vincenzo Alessi and Susan Alessi
- Bayonne Durable Construction Co., Inc. - owned by Gaetano Alessi, Sr.
- Duraport Holding Company, LLC - owned by Vincenzo Alessi
- Duraport Marine and Rail Terminals, LLC - owned by Vincenzo Alessi
- Duraport Rail Terminal, LLC - owned by Vincenzo Alessi
- Duraport Ready-Mix, LLC - owned by Vincenzo Alessi
- Duraport Realty Four, LLC - owned by Vincenzo Alessi
- Duraport Realty One, LLC - owned by Vincenzo Alessi
- Duraport Realty Three, LLC - owned by Vincenzo Alessi
- Duraport Realty Two, LLC - owned by Vincenzo Alessi
- Duraport Terminal Equipment, LLC - owned by Vincenzo Alessi
- Hobart Realty Limited Liability Company - owned by Vincenzo Alessi
- Hudson Keystone Express, LLC - owned by Duraport Holding Company, LLC and HC Associates, Inc.[14]
- North Street Development, LLC - owned by Vincenzo Alessi
- Peninsula Court II, LLC - owned by Vincenzo Alessi
- South Cove Management, LLC - owned by Vincenzo Alessi

---

[13] Plaintiff agrees in its Responsive Statement of Material Facts that "Rocky Aversa, who is an outsider to the Alessi family, has always owned a 30% interest in 52nd Street Associates, LLC." (*See* BED SMF ¶ 3; Pl. SMF ¶ 3). In any event, 52nd Street Associates, LLC, could not be part of a Duramix controlled group because Rocky Aversa never owned any interest in Duramix. (*See* Alessi Dec. ¶ 10 & Ex. A).

[14] Plaintiff agrees that HC Associates, Inc., is "a Pennsylvania corporation owned and controlled by outsiders to the Alessi family [and] has always owned a 50% interest in . . . Hudson Keystone Express LLC." (*See* BED SMF ¶ 4; Pl. SMF ¶ 4).

(*See* BED SMF ¶ 6; Alessi Dec. ¶ 10 & Ex. A; Pl. SMF ¶ 6).  Because the above twenty BEDs did not have the "same five or fewer" owners as Duramix on the date of Duramix's withdrawal, they are entitled to judgment as a matter of law on Count 4 of Plaintiff's Complaint.  Accordingly, Count 4 is dismissed *with prejudice* as to the above twenty BEDs.

### c.  *Plaintiff's arguments in opposition to summary judgment*

Plaintiff's only relevant opposition[15] to BEDs' Motion for Summary Judgment contends that "[BEDs] fail to perform the necessary analysis required by 26 C.F.R. § 1.414(c)-2" for determining controlling interest and that BEDs fail to reference or analyze "the attribution rules" under 26 C.F.R. § 1.414(c)-4(b), which "permit ownership to be imputed to entities and/or individuals due to such relationships as between spouses, parents/children, and/or the existence of trusts."  (Pl. Opp. Br. at 17-18).  Plaintiff argues that these "failures" establish that BEDs "have failed to demonstrate the absence of factual issues regarding the controlling interest portion of the control group analysis."  (*Id.* at 18).

Plaintiff's arguments are unavailing.  First, as discussed previously, the undisputed facts establish that ten BEDs were not even in existence at the time of Duramix's withdrawal, so no controlling interest analysis would be necessary; as a matter of law, entities formed *after* a withdrawal date cannot be part of a controlled group with the withdrawing employer.  *See Centra*, 983 F.2d at 502; *Barker & Williamson*, 788 F.2d at 123; *Brigadier Leasing Assocs.*, 880 F. Supp. at 396.  Further, the undisputed facts also establish that twenty BEDs did not have the appropriate

---

[15] Indeed, most of Plaintiff's opposition to BEDs' Motion for Summary Judgment on Count 4 concerns the "trades or businesses" status of certain BEDs.  (Pl. Opp. Br. at 18-22).  But, while BEDs argued in their moving brief that certain BEDs could not be "trades or businesses" within the meaning of ERISA, (Def. Mov. Br. at 22-24), BEDs conceded in their reply papers that material facts remain in dispute concerning whether those particular BEDs were "trades or businesses," (Def. Reply Br. at 9-10).  Accordingly, much of Plaintiff's opposition is inapposite to the discussion herein.

ownership structure on the withdrawal date to qualify as an entity under common control with Duramix.  Notably, Plaintiff does not argue that BEDs' contentions are incorrect.

Second, Plaintiff, as the nonmoving party, "must offer specific facts that establish a genuine issue of material fact, not just 'some metaphysical doubt as to the material facts.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  But that is just what Plaintiff has done, offering no indication how the attribution rules might affect the ownership structures outlined in the record. Again, Plaintiff does not contend that BEDs' arguments are incorrect, only that BEDs did not "analyze" the attribution rules.  Because the Court's analysis of potential controlled-group liability was performed on the basis of undisputed material facts, and because Plaintiff has pointed to nothing to suggest that the above-mentioned thirty BEDs are not entitled to judgment as a matter of law, this Court's conclusion is not swayed by Plaintiff's opposition arguments.

### ii.  *Certain BEDs Are Not Entitled to Summary Judgment on Count 4*

BEDs concede that genuine issues of material fact exist with regard to six BEDs' potential membership in the Duramix controlled group:

- Bridge Ave. Associates, Inc.
- C.&A. Development Corp.
- Durable Recycling, LLC
- South Cove Development II, LLC
- South Cove Development, LLC
- South Cove Partners, LLC

(*See* Pl. Opp. Br. at 17-22; Def. Reply Br. at 9-10 ("Defendants will concede that, at this stage, there are open questions of fact . . . .")).  Those genuine issues of material fact preclude summary judgment against those six BEDs.  *See Celotex*, 477 U.S. at 323.  Accordingly, BEDs' Motion for Summary Judgment as to those six BEDs is denied.

BEDs' Motion for Summary Judgment is also denied as to Peninsula Court, LLC, Alessi Partners, LLC, and Durable Recycling Holdings, LLC.

First, judgment as a matter of law is inappropriate as to Peninsula Court, LLC because that BED had an ownership structure that would permit it to qualify as "under common control" with Duramix on the withdrawal date. Peninsula Court, LLC, is owned in equal 50% shares by Bridge Ave. Associates, LLC, and Peninsula Court II, LLC. (BED SMF ¶ 6; Alessi Dec. ¶ 10 & Ex. A). Bridge Ave. Associates, LLC, is owned as follows: 71.4 voting shares are owned by The 2014 Gaetano Alessi Revocable Trust;[16] 9.52 voting shares are owned by Vincenzo Alessi; 9.52 voting shares are owned by Francesco Alessi; and 9.52 voting shares are owned by Nancy Alessi. (BED SMF ¶ 6; Alessi Dec. ¶ 10 & Ex. A). Thus, through the ownership in Bridge Ave. Associates, LLC, Gaetano Alessi, Jr., Vincenzo Alessi, Francesco Alessi, and Nancy Alessi owned the following percentages of Peninsula Court, LLC: 35.7% to Gaetano Alessi, Jr.; and 4.76% each to Vincenzo, Francesco, and Nancy Alessi.

Peninsula Court II, LLC, the other 50% owner of Peninsula Court, LLC, was 100% owned by Vincenzo Alessi on the date of Duramix's withdrawal. (BED SMF ¶ 6; Alessi Dec. ¶ 10 & Ex. A). Thus, through his ownership in Peninsula Court II, LLC, Vincenzo Alessi owned another 50% of Peninsula Court, LLC.

---

[16] Under the regulations used to determine ownership in particular circumstances—*i.e.*, the "attribution rules"—"[a]n interest in an organization . . . owned . . . by [a] . . . trust shall be considered as owned by any beneficiary of such . . . trust who has an actuarial interest of 5 percent or more in such organization." 26 C.F.R. § 1.414(c)-4(b)(3)); *see also United Food & Commercial Workers Union v. Progressive Supermarkets*, 644 F. Supp. 633, 640 (D.N.J. 1986) ("[U]nder the relevant regulations the interests held by the Anna Margulis Trust and William Margulis Trust must be attributed to William Margulis because he held a life estate in both trusts." (citing 26 C.F.R. § 1.414(c)-4(b)(3))). Although trust documents for the various trusts that own certain percentages of the BEDs are not part of the record, the Court construes the ownership interest of the trusts in the manner most favorable to Plaintiff—that is, the Court considers the beneficiary of a trust to be the person for whom the trust is named where doing so will render a BED a possible member of a controlled group with Duramix. Thus, for example, the Court deems The 2014 Gaetano Alessi Revocable Trust—at issue with respect to Bridge Ave. Associates, Inc.—as reflecting Gaetano Alessi, Jr., as the beneficiary and, in turn, permitting Bridge Ave. Associates, Inc. to qualify as a possible member of a controlled group with Duramix.

The attribution rules also establish the allocation of individual ownership where an entity is owned by another entity. *See* C.F.R. § 1.414(c)-4(a) ("In determining the ownership of an interest in an organization for purposes of § 1.414(c)-2 [*i.e.*, organizations under common control] . . . , the constructive ownership rules of paragraph (b) of this section shall apply."). The Court's analysis reflects application of the rules for constructive ownership and attribution of ownership to individuals who own interests in a corporation. *See* C.F.R. § 1.414(c)-4(b)(4).

Accordingly, on February 19, 2010, Peninsula Court, LLC was owned as follows:

- 54.76% - Vincenzo Alessi
- 35.7% - Gaetano Alessi, Jr.
- 4.76% - Francesco Alessi
- 4.76% - Nancy Alessi

Using the pre-October 2009 Duramix ownership structure as a baseline, Peninsula Court, LLC, appears to have been owned by the same five or fewer persons—with a controlling interest and effective control—that owned Duramix. Accordingly, judgment as a matter of law is inappropriate as to Peninsula Court, LLC on Count 4.

Second, judgment as a matter of law is inappropriate as to Alessi Partners, LLC, and Durable Recycling Holdings, LLC, because Plaintiff has asserted an "avoid and evade" liability claim in this matter. (*See* Compl. ¶¶ 103-106).[17] Under the MPPAA, "[i]f a principal purpose of any transaction is to evade or avoid liability under this part [*i.e.*, withdrawal liability], this part shall be applied (and liability shall be determined and collected) without regard to such transaction." 29 U.S.C. § 1392(c); *see also Swerdlick v. Am. Compressed Gases, Inc.*, No. 14-4774, 2015 WL 1422046, at *6 (D.N.J. Mar. 26, 2015) (explaining that the MPPAA's "evade or avoid" provision "explicitly provides that any transaction designed to 'evade or avoid' withdrawal liability should be ignored—that is, it should be presumed that the purportedly 'sham' transaction did not occur—in determining a party's legal status as an employer").

Here, the undisputed facts show that both Alessi Partners, LLC, and Durable Recycling Holdings, LLC, changed their respective ownership structures in October 2009—just prior to Duramix's withdrawal. (BED SMF ¶ 6; Alessi Dec. ¶ 10 & Ex. A; Pl. SMF ¶ 6). And, those

---

[17] While the Court concludes above that Plaintiff's Complaint, as pleaded, fails to state a claim for avoid-and-evade liability, Plaintiff will have the opportunity to amend its Complaint. Accordingly, the Court assumes only for purposes of analyzing the Summary Judgment Motion as to Alessi Partners, LLC, and Durable Recycling Holdings, LLC, that any amended complaint will state a claim for avoid-and-evade liability.

BEDs' pre-October 2009 ownership structures were such that they could have been potential members of a Duramix controlled group without the changes. (Alessi Dec. ¶ 10 & Ex. A). Without deciding whether such changes were made with the "principal purpose . . . to evade or avoid liability," on this record and at this stage of the litigation, the Court cannot say as a matter of law that Alessi Partners, LLC, and Durable Recycling Holdings, LLC, were not part of a controlled group with Duramix on Duramix's withdrawal date. Accordingly, summary judgment is denied to those two BEDs on Count 4.

**V.  CONCLUSION**

For the foregoing reasons, BEDs' Motion to Dismiss is GRANTED in part and DENIED in part. Count 1 and Count 6 are dismissed *with prejudice*. Count 2 and Count 5 are dismissed *without prejudice*. BEDs' Motion for Summary Judgment on Count 4 of the Complaint is GRANTED in part and DENIED in part. Plaintiff may file an amended complaint—consistent with the rulings in this Opinion and addressing the deficiencies identified herein—within 30 days. An appropriate Order accompanies this Opinion.

*s/ Esther Salas*
**Esther Salas, U.S.D.J.**
